THE ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Plaintiff-Appellant, v. LEONARD DICKE *et al.,* Defendants-Appellees.

Second District   No. 2—90—0396

Opinion filed February 8, 1991.—Rehearing denied March 8, 1991.

Neil F. Hartigan, Attorney General, of Springfield (Robert E. Douglas, Special Assistant Attorney General, and Katherine L. Lee, Malcom E. Erickson, and Victor Cacciatore, Assistant Attorneys General, of Oak Brook, of counsel), for appellant.

Edward T. Graham, of Wheaton, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal from the second jury verdict entered in this eminent domain action filed by the plaintiff, the Illinois State Toll Highway Authority (the Tollway), to acquire property owned by the defendants (the Dickes) in connection with the construction of I-355, the north-south tollway. The property is located east of, and adjacent to, the alignment of the north-south tollway, 356 feet north of 75th Street and 660 feet west of Woodward Avenue in Woodridge, Illinois. The defendants filed a cross-petition alleging that the property condemned is part of a larger tract of land which is owned and used in common by them and that the taking will result in a lessening of value and damages to the remainder.

In the first trial, a verdict was returned in the amount of $46,000 for the part taken. No damages to the remainder of the property were found by the jury. A post-trial motion was timely filed by the Dickes and a new trial was granted. A verdict in the second trial was returned in the amount of $77,750 as just compensation for the part taken and $18,000 for damage to the remainder. The Tollway's post-trial motion was denied, and it brings the instant appeal.

The Tollway contends the trial court committed reversible error when it (1) allowed defendants' counsel to argue and their expert witnesses to testify concerning a post-taking offer to purchase the defendants' property; (2) ruled that the claimed damages were compensable and attributable to the Tollway; and (3) gave a jury instruction which unduly highlighted an element of damage. We reverse and remand.

On January 4, 1988, the Tollway filed its complaint to condemn a portion of property owned by the Dickes in Woodridge. The piece of property owned by the Dickes is essentially a flag-shaped parcel comprised of 4.39 acres. A 50-foot by 270-foot strip extends down beyond the left-hand (west) side of the flag, so to speak. The property has an irregular elevation which slopes downward about 20 feet across the parcel to the southeast. The portion of the property being acquired by the Tollway on the west side of the parcel is an elongated triangle and contains 35,182 square feet, which is approximately eight-tenths (.8) of an acre.

In 1969, about 20 years prior to the instant condemnation, a portion of the Dicke property was acquired by the Illinois Department of Transportation (IDOT) for a freeway project designated FA-61. As part of that project, an access road was to be constructed from 75th Street to the southwest corner of the Dicke property remainder. Rather than a freeway, however, a tollway was constructed (the north-south tollway). An underpass rather than an overpass was constructed at 75th Street, and an access road from 75th Street to the southeast, rather than southwest, corner of the Dicke property was constructed.

The Dickes proceeded first at the instant trial of the cause. They presented two expert appraisal witnesses. The first, Timothy Sullivan, testified to his credentials and appraisal experience. He described the three methods of appraising property are the market, cost and income approaches. Using the market approach, which is based on comparing sales of properties similar to the one being appraised, he appraised the Dicke property in early summer 1988. He testified that it is vacant property with irregular topography. He described the surrounding area as a mixed commercial use with some multifamily and some vacant areas. He noted that the subject property is currently zoned R-1 residential in Woodridge. Sullivan was of the opinion that a reasonable probability for rezoning existed as of the property valuation date, January 4, 1988. It was Sullivan's opinion that, as of that valuation date, the highest and best use of the property was business/office.

In arriving at an opinion of the fair cash market value of the property, Sullivan considered 30 or 40 sales in all, but used three sales and one offer for the purchase of the subject property in trying to find a square-foot value for the subject property. Sullivan testified to the three sales and the upward and downward adjustments he made in comparing them to the subject property. The first of the three sales—all of which were sales of vacant land and which were within one-half mile of the subject property—was an 18.5-acre parcel (the Ravenswood sale) which sold for $2.51 per square foot in October

1984. The second was a 4.66-acre parcel (the Devereaux sale) which sold for $3.82 a square foot in September 1985. The third was an eight-tenths-of-an-acre parcel (the Lunan sale) which sold for $4.43 per square foot in September 1985. As to the offer, he testified an offer of $5 per square foot for the entire parcel was made in the spring of 1988, subject to four or five contingencies.

Sullivan's opinion of the fair cash market value of the whole property as of the valuation date was $662,000 or $3.50 per square foot. His opinion of the value of the part taken was $123,000 or $3.50 per square foot. Subtracting the latter value from the former, he valued the remainder as a part of the whole at $539,000. He valued the remainder, standing alone after the taking, at $464,000.

In arriving at his opinion of value for the remainder after the taking, Sullivan relied on numerous factors. He relied on changes made by the Tollway in construction of the north-south tollway, in that the interchange built at 75th Street was now an underpass instead of an overpass. In his opinion, this resulted in dirt fill being deposited on the property owned by Gallagher & Henry immediately north of the Dickes' which changed the drainage on the Dicke property. Runoff water which normally would have been detained in the low spot at the southeast corner of the Gallagher & Henry property now flows south and west across the Dicke property.

Another factor Sullivan relied on was that the frontage access road was built to the southeast corner of the property as opposed to the southwest corner as originally planned by IDOT. In his opinion, this resulted in less desirable drainage to the property, as all of the water from the access road is collected in the road's storm sewer and discharged onto the Dicke property, where it flows north for 10 to 15 feet and then drains to the southwest across the property. Sullivan also considered that the change in the access road alignment now requires the Dickes to fill the property, assuming future commercial development to the remainder, since, as built, the access road is six to eight feet above grade. The connecting access road would have to be constructed along the south line of the Dicke property and thence northward if all the useable parcels were to face the tollway. The southwest corner of the property is higher than the southeast, and, if the road had been built there, some of the fill required would have been eliminated. Subtracting the value of the remainder standing alone ($464,000) from the value of the remainder as a part of the whole ($539,000), Sullivan's opinion of damage to the remainder after the taking was $75,000.

The defendants' second expert appraiser, Arthur Sheridan, testi-

fied to his credentials and real estate appraisal experience. Sheridan testified that, although he had known the defendants' other expert witness, Timothy Sullivan, for about 20 years and had been involved in other appraisals in which Sullivan was also involved, he did not collaborate with him.

Sheridan's opinion of highest and best use of the Dicke property as of the valuation date was for commercial/industrial purposes. In arriving at that opinion, he considered the topography of the Dicke property, the zoning, the trend of development in the general area, the history of zoning in Woodridge, the access to the property and how nearby properties were tending to develop. As of the valuation date, Sheridan was of the opinion that there was a reasonable probability of rezoning the property to a commercial/industrial status. Sheridan described the topography of the subject property and the uses of the surrounding property consistently with the testimony of expert witness Sullivan.

Also using the market approach in valuing the property, Sheridan testified he considered 40 to 50 properties in the area for his market study, including the Ravenswood, Devereaux and Lunan sales considered by Sullivan. Sheridan testified he was "familiar" with the offer to purchase the Dicke property for $5 per square foot. He learned in talking with people at the Village of Woodridge that inquiries had been made about developing the property. He phoned one such inquirer, Jay Eigel of Charter Associates, and learned that a $5-per-square-foot offer had been made, subject to assemblage and rezoning for commercial purposes. Although Sheridan did not include the offer in his written appraisal report, he testified he did consider it along with the Ravenswood, Devereaux and Lunan comparable sales.

Sheridan testified his opinion of value for the whole property as of the valuation date was $680,000 or $3.50 per square foot. In arriving at this opinion, he relied on the location of the property, its configuration, its zoning, the probability of being able to rezone a higher use, the availability of utilities, the roadways that were adjacent to it or available to it, the master plan of the Village of Woodridge, trends of development in the area, and the experience and knowledge that come through a lifetime of appraising. His opinion of value of the part taken was $127,000. Sheridan's opinion was that the remainder as a part of the whole had a value of $553,000.

Sheridan then gave his opinion as to the value of the remainder standing alone after the taking. In arriving at this opinion, he considered the following factors: its location, utilities, the availability of access, topography and the difficulty in draining the property which has

occurred since the deposit of dirt fill on the property immediately to the north. In addition, he also considered the grade of the access road and the drainage along the access road. His opinion of the fair cash market value of the remainder of the Dicke property, standing alone after the taking, was $483,000. Sheridan stated that the elements of damage centered primarily on drainage. He pointed to the drainage problem created by the construction of the access road to the southeast rather than to the southwest corner of the property. He also noted the uselessness of the 50-foot-wide strip of land extending southward from the southwest corner of the property which the Dickes originally reserved to facilitate access to the parcel. Subtracting the value of the remainder standing alone ($403,000) from the value of the remainder as a part of the whole ($553,000), Sheridan's opinion of the damage to the remainder was $70,000.

The Tollway presented the testimony of its expert appraiser, James Curtis. Curtis testified to his credentials, experience and appraisal methods. He testified that, based upon his observation of the property, its surroundings, the major road adjacent to it and the apartment zoning immediately to the north of it, his opinion of highest and best use for the subject property was office/research development. Further, it was his opinion there was a reasonable probability of rezoning the property for this use. He explained that, in using the market approach to appraising the Dicke property, he found very few properties that were similar. Consequently, he relied on only one sale, the Stade sale, in appraising the subject property. The Stade parcel is a 40-acre parcel of land about one mile north of the subject property located along the south side of 63rd Street immediately to the east of what is now the north-south tollway. Prentiss Creek divides the Stade parcel into two 20-acre pieces, and only the rear 20 acres of the parcel were sold. Zoned residential and improved with sewer but not water, the parcel was sold in June 1984 subject to rezoning to permit a drug and alcohol rehabilitation hospital. The Stade property sold for $725,000.

Based on his research, his inspections of the subject property, the comparable sale of the Stade property and his knowledge and experience as a real estate appraiser, Curtis opined that the value of the subject property as of the valuation date was $91,300 or $21,000 an acre. This computes to approximately $.50 per square foot. He arrived at this opinion of value of the Dicke property by discounting the Stade sale by 50% because the Stade property was, in his judgment, better than the Dicke property, and he increased the discounted price by 15% to reflect the time difference between 1984 and 1988.

Curtis admitted he did not know what portion of the Stade property was in the floodplain, but he believed that there was very little floodplain. Herbert Stade, the seller of the Stade property, testified, however, that 10.94 acres of the property were in the floodplain and that the majority of those acres were on the piece to the south which was the piece sold to the hospital. Hence, a large portion of the 20-acre tract sold was not buildable. Curtis also originally testified that storm water drained from the southeast corner of the Dicke property to the north and then to the east. Later, on cross-examination, he testified that drainage was actually westerly from the southeast corner of the Dicke property and that the lowest elevation on the Dicke property was 4.7 feet lower than the southeast corner of the property.

Curtis' opinion of the fair cash market value of the part taken was $17,000. Subtracting that figure from the value of the whole of $91,300, the fair cash market value of the remainder as part of the whole was $74,300. Curtis' opinion of the value of the remainder, standing alone after the taking, was $106,000. This increased value for the remainder standing alone after the taking was based on what Curtis felt was better utility and better access after the taking. Curtis indicated that, after the taking, the owner would be relieved of the cost of developing the 50-foot strip on the southwest side of the property which had been reserved for access road purposes, thus saving associated costs, and the strip could be sold because it was not needed for the roadway. Accordingly, Curtis ascribed $0 damage to the remainder of the Dicke property after the taking.

Jay S. Eigel, employed by Charter Associates, testified that he had not had any conversations within the last five years with either of the defendants' expert witnesses, Sullivan nor Sheridan, nor had he received correspondence from either of them. He was first in contact with defendants' counsel, however, in June or July 1988 regarding the availability of the Dicke property for purchase. The initial contact between the Dickes and Charter Associates which was referred to in a July 20, 1988, letter to Eigel from defendants' counsel concerned an option to purchase the property. According to Eigel's testimony, his company made a number of offers to purchase the property ranging from $4 a square foot to $6 a square foot. None of those offers was pending on January 4, 1988. He recalled specifically he signed a contract offering to purchase the property for $945,000 subject to contingencies. Eigel also testified his company is pursuing seven properties in the area bounded by 71st Street, 75th Street, Woodward Avenue and the north-south tollway and has deposited substantial earnest money on them.

The Tollway made an offer of proof as to the testimony of two witnesses, Ralph Freeman of Brown & Lambrecht, the general contractor for the north-south tollway, and James Canham, the Tollway's project coordinator. The court barred these witnesses from testifying upon defendants' pretrial motion *in limine*, and, upon oral motion of the Tollway, an offer of proof was accepted. According to the offer, Freeman, if allowed to testify, would state that there was a contract between Brown & Lambrecht and Gallagher & Henry whereby Gallagher & Henry, in consideration for $10, agreed to accept fill from the 75th Street underpass which Brown & Lambrecht was to dispose of during construction of the tollway. He further would have testified that the dirt and clay which were placed north of the property were not part of the design of the tollway and that the Tollway did not have knowledge that the dirt and the clay were placed on the Gallagher & Henry parcel. Freeman would also testify that, had there not been a contract between Brown & Lambrecht and Gallagher & Henry, the dirt would have been brought to a facility at Route 53 and 75th Street, the Green Valley Sanitary Landfill.

Canham, if called as a witness, would testify that clay and dirt placed upon the Gallagher & Henry property north of the Dicke property were not part of the design for the north-south tollway and that it was Brown & Lambrecht's job to remove the dirt and to dispose of it as it saw fit, including contracting with other parties, if it so desired.

As noted above, the jury found just compensation in the amount of $77,750 for the part of the Dicke property which was taken and $18,000 damage to the remainder of the Dicke property.

The Tollway's first contention is that reversible error occurred because the court allowed evidence of the post-filing offer to purchase the Dickes' property to come before the jury. After defendants' counsel raised the matter of the offer four times during opening argument, the Tollway moved for a mistrial which the court denied. In denying the motion, the court stated:

> "[The offer to purchase] may come in on a limited basis as a basis for the expert's opinion under Beeson-vs-IDOT, Wilson-vs-Clark, 703, 705.
>
> I think that an expert when he opines can reasonably rely upon an offer to purchase as long as it isn't something hokey between the parties and I realize that—between one of the parties and a relative or something—as long as it's arm's length, and I agree it has a problem insofar as an offer is concerned in that it's contingent upon zoning, but I think that the expert can still rely upon it.

You make the objection at the appropriate time when the expert starts talking about it. I'll tell the ladies and gentlemen of the jury how to rely upon that, that it's just a basis for his opinion."

During trial, expert witnesses Sullivan and Sheridan each testified they "considered" the offer in arriving at their respective opinions of the fair cash market value of the part taken and the damage to the remainder standing alone after the taking. On several occasions during trial, the court instructed the jury how to treat evidence of the offer to purchase, e.g.:

"[THE COURT]: Folks, let me tell you how we have to deal with this issue.

Offers made for the subject property after the valuation date can be relied upon by this gentleman as an expert to bolster up his opinion as to its value on the date of the evaluation date; namely, January 4, 1988.

Any offer made after January 4, 1988 obviously would not be known to any person on January 4, 1988 because it hadn't occurred yet.

But he can rely upon subsequent offers in telling you what his opinion of the value of this property was on January 4, 1988."

Defendants' counsel subsequently referred to the offer seven more times during his closing and rebuttal arguments, stating, e.g.:

"[T]he Dicke family and I, their attorney, have been negotiating with Mr. Eigel and his associates over the course of the last year or so, and we have been talking $5 a square foot and our own appraisers are telling us it's $3.50 a square foot.

Now, in our heart we believe we are entitled to $5 a square foot but the appraisers are the experts.

* * *

All right. Well, we are here and we are *** asking you for $3.50 a square foot, not $5 but $3.50 because that's what our appraisers are telling us from their analysis that they have concluded, and we accept their good judgment in that regard.

We don't like it. In our hearts we think we are entitled to $5 a square foot, but we don't like it.

* * *

I ask, ladies and gentlemen, again I say in our hearts we think we deserve $5 a square foot for our property because that's what we are giving up."

The Tollway argues that because there was evidence of other com-

parable actual sales, evidence of the offer to purchase was inadmissible, albeit offered as evidence of the basis for the defendants' experts' opinions, and particularly since the offer to purchase was made after the filing of the condemnation petition.

The defendants contend it was within the discretion of the trial judge to admit evidence of the offer for the limited purpose of "showing what the expert considered and how he considered it and to test the experts' credibility before the jury, allowing the jury, rather than the court, to ascertain the validity of the experts' opinions and conclusions."

■ In *Wilson v. Clark* (1981), 84 Ill. 2d 186, the supreme court adopted for use in Illinois Federal Rules of Evidence 703 and 705. Those rules provide:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed. R. Evid. 703.

> "The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705.

Rules 703 and 705 were found applicable to real estate valuation witnesses in eminent domain actions in *Department of Transportation v. Beeson* (1985), 137 Ill. App. 3d 908. Noting there that "[i]t is common knowledge that valuation witnesses routinely consider different comparable sales when determining the value of a particular piece of property," (137 Ill. App. 3d at 911), we found the defendants' expert valuation witnesses should have been allowed to testify to the comparable sales each of them considered in arriving at their respective valuation of the property taken and the damage caused to the remainder.

■ Actual sales of similarly situated property in the vicinity of that condemned have, in fact, been recognized as the best evidence of the value of the condemned property. (*City of Chicago v. Lehmann* (1914), 262 Ill. 468, 474.) In the absence of such evidence, *bona fide* offers to purchase provide some evidence of the fair cash market value of the property, provided such offers are *bona fide* and are made before the property is condemned. (*City of Chicago v. Blanton* (1958), 15 Ill. 2d 198, 201; *Department of Public Works & Buildings v. Lambert* (1952), 411 Ill. 183, 191; *Lehmann*, 262 Ill. at 474.) Be-

cause the value of property taken for public use is fixed as of the time of filing the petition in eminent domain (*Department of Public Works & Buildings v. Association of Franciscan Fathers* (1977), 69 Ill. 2d 308, 314; *Forest Preserve District v. Eckhoff* (1939), 372 Ill. 391, 395), an offer to purchase the condemned property which is received subsequent to the filing of the condemnation petition is considered inadmissible and properly excluded (*Department of Public Works & Buildings v. Finks* (1956), 10 Ill. 2d 15, 19; *Eckhoff*, 372 Ill. at 395).

■■ Notwithstanding the provisions of Rule 703, whether an expert will be permitted to testify as to the bases for his opinion is a decision which rests in the sound discretion of the trial court. In exercising its discretion, the court must consider whether the underlying facts or data are of the type reasonably relied upon by experts in the particular field; the court bears an independent responsibility to decide if the bases meet minimum standards of reliability and, thus, are admissible. (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 186.) The trial court's decision in this regard will not be disturbed unless its discretion has been abused. *Anthony*, 136 Ill. 2d at 186.

■■ The mere fact that an expert has based his opinion on some information or data does not automatically ensure its admissiblity under Rule 703. "If another rule of law applicable to the case excludes the information sought to be relied upon by the expert, the information may not be permitted to come before the jury under the guise of a basis for the opinion of the expert." *Anthony*, 136 Ill. 2d at 186.

■■ ■ Within the context of the instant cause, it is eminent domain law which controls the admissibility of evidence that is offered either for its truth or for the limited purpose of explaining the basis for an expert's opinion. Although evidence conflicted at trial as to the exact date of the $5-per-square-foot purchase offer, it is undisputed that it was not made until after the Tollway filed its complaint to condemn on January 4, 1988. In light of that particularly, and due to the fact there was other proper evidence of actual comparable sales, we find evidence of the offer to purchase was inadmissible, and it was an abuse of the court's discretion to admit it even for the limited purpose it described to the jury. Inasmuch as "[o]nly such opinions as are based on evidence of lawful elements of damage can be of benefit to a jury in the assessment of the amount of damage" (*Illinois Power & Light Corp. v. Talbott* (1926), 321 Ill. 538, 544; accord *Anthony*, 136 Ill. 2d at 187), Sullivan's and Sheridan's opinions were excludable because they were based in part on the post-filing offer to purchase.

The Tollway argues the error in allowing evidence of the post-filing offer to come before the jury is reversible because it was severely

prejudiced by the admission of this improper evidence. It points to the supplemental record of the first trial of this cause in which no post-filing offer to purchase was mentioned and contrasts the jury's $46,000 verdict there with its $77,750 verdict here for the part taken. It further asserts the Dickes' decision not to introduce evidence of the post-filing offer to purchase in the first trial but to use it in the second is a tacit admission of its irrelevance and inherent unreliability. Defendants argue in response that no undue influence is evident because the jury's verdict was greater than the value testified to by the Tollway's expert, yet substantially less than either the defendants' expert witnesses' opinions of value or the $5 per-square-foot offer to purchase.

■■ ■ We agree with the Tollway that the error was reversible. In condemnation proceedings, where testimony as to value is in conflict, and the verdict is within the range of the testimony, the jury's award will not be disturbed unless there has been a clear and palpable mistake or the verdict is the result of passion and prejudice (*Iowa-Illinois Gas & Electric Co. v. Hoffman* (1984), 127 Ill. App. 3d 496) or there was some erroneous ruling that might have misled the jury and which amounts to prejudicial error (*Department of Public Works & Buildings v. Oberlaender* (1968), 92 Ill. App. 2d 174, 190-91, aff'd (1969), 42 Ill. 2d 410, 418).

Both the defendants and the Tollway are entitled to have the amount of compensation owed for the taking determined fairly. In the case at bar, we cannot say with any certainty that the jury's verdict would have been the same if it had not heard the improper evidence of the post-filing offer to purchase. There is also no way to determine how the defendants' expert witnesses' opinions of value would have differed had they not considered the fact of the post-filing offer to purchase. Although those witnesses may have been able to place evidence of that offer in its proper perspective given their real estate appraisal experience, the jurors, we think, would not have been able to do that and understandably could have empathized, even a little, with the defendants' view that "in their hearts" they deserved $5 per square foot for the property taken from them. Although the jury's verdict fell within the range of the evidence, it nonetheless was considerably more than the 50¢-per-square-foot value ascribed to the property by the Tollway's expert witness and, in fact, was more than a "split the difference" compromise which would have yielded a $2-per-square-foot value.

We conclude the judgment of the circuit court of Du Page County must be reversed and the cause remanded for a new trial. We proceed

to consider the merits of the remaining issues only insofar as they may arise on retrial.

The Tollway argues the $18,000 damages found to the remainder of the property are not compensable because they are not the direct proximate consequence of the taking or of the use of the property taken. It asserts the damages were not caused by the taking but were the result of Gallagher & Henry allowing the dirt fill to be placed on its property, thereby altering the water retention capacity of its property and increasing the amount of drainage flowing onto the defendants' property. It contends it was error for the court to rule as a matter of law that the damages were attributable to the Tollway and to refuse Freeman's and Canham's testimony offered to rebut the defendants' damage causation evidence. Lastly, it argues that damages caused by third parties are not of a type recoverable in eminent domain proceedings.

The defendants argue the court correctly granted its motion *in limine* to bar any testimony that the Tollway was not liable in damages to them for the placing of the dirt fill on the Gallagher & Henry property. They point out the Tollway did not move to strike portions of their expert witnesses' testimony concerning the damage caused by the dirt fill, thus waiving the issue, and the court's decision to exclude the rebuttal testimony is supported by Illinois law which favors settlement of the entire controversy in one lawsuit. Defendants further assert that the jury's damage award is supported by more than simply the damage caused by the dirt fill being placed on the property to the north.

We find the damages caused by the dirt fill were not compensable in the instant eminent domain proceeding. We note preliminarily that we do not consider whether the Tollway may have waived this issue inasmuch as we have already determined that the cause must be retried. We further hasten to note that we agree with the defendants that the jury's damage verdict likely was also based on evidence of several other elements of damage to the remainder which the Tollway has not challenged and which we do not consider here, *e.g.*, construction of the access road to the southeast corner of the property, leaving the area reserved by the Dickes at the southwest corner of the property virtually a useless strip of land; construction of the access road at an elevation of six to eight feet above the grade of the Dicke property, making it necessary for the Dickes to raise their property in order to use the road; and installation of a storm sewer in the access road in such a manner that all storm water drains upon and over the Dicke property. Consequently, the only damages we find were noncom-

pensable in eminent domain are those attributable to the dirt fill placed on the Gallagher & Henry property.

■ Article I, section 15, of the 1970 Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." (Ill. Const. 1970, art. I, §15.) This constitutional provision is presently codified in article VII of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 7—101 *et seq.*) The parties agree that the sole object of a condemnation proceeding is to ascertain the just compensation to be paid. *Department of Public Works & Buildings v. Sohm* (1925), 315 Ill. 478, 482-83.

> "The jury in a condemnation suit is called only for the purpose of finding values and fixing damages. [Citations.] The narrow issue thus submitted to a jury cannot be broadened nor the verdict of the jury influenced by the interjection of immaterial matters, especially matters calculated to be prejudicial. Whether or not the project is necessary or advisable, or the necessity for taking the property, or whether more property is taken than necessary, and whether or not it is ever paid for or who pays the judgment, are not questions for the jury to consider, nor to be brought before it in any way." *St. Clair Housing Authority v. Quirin* (1942), 379 Ill. 52, 56-57.

■ The settled measure of damage to the remainder "is the depreciation in value of the land not taken which results from the taking, that is, the difference between the fair cash market value of the part not taken unaffected by the improvement and its fair cash market value as affected." (*Department of Public Works & Buildings v. Bloomer* (1963), 28 Ill. 2d 267, 270.) For damages to be compensable in an eminent domain proceeding, the damage must be the direct and proximate result of the taking. *Department of Transportation v. Lake Ka-Ho, Inc.* (1981), 98 Ill. App. 3d 1052, 1055; *Department of Public Works & Buildings v. Horejs* (1967), 78 Ill. App. 2d 284.

In *Horejs*, this proximate causation was found not to exist. There, the "taking" from the defendants was of a small triangular piece of vacant land from a corner of the defendants' improved residential tract. This piece of land was taken to facilitate drainage of a frontage road superimposed on a preexisting road fronting the defendants' tract. Across the road from the defendants' property, land was acquired from other property owners, and an expressway was constructed along the top of an embankment. Defendants claimed damages to the remainder alleging, *inter alia*, interference with or obstruction to view, light and air, caused by the embankment. The plaintiffs sought to prevent the admission of value evidence of dam-

age to the remainder allegedly caused by the embankment, but the court denied its motion. Evidence of damage caused, in part, by the embankment was received at trial, and the jury awarded the defendants $2,000 for damage to their remainder.

In reversing the damage award and remanding the cause, the court agreed with the plaintiff that the damage which may have flowed from the taking or use of the property acquired from the defendants' neighboring property owners formed no basis for damage to the defendants' remainder. The damage suffered by the defendants because of the building of the expressway was not particular to the defendants' property, but, rather, was suffered in common by all lands in the vicinity. Because "the actual taking or the use of the part actually taken must be the direct physical cause of the damage to the remainder" (*Horejs*, 78 Ill. App. 2d at 291), the court found the damage alleged was not the direct and proximate consequence of the taking of the defendants' property. We note the *Horejs* court found no fault with the defendants' evidence that the taking caused a reduction in the square footage of the remainder of the lot which would necessitate a zoning variation to comply with municipal septic tank requirements.

Similarly, in *Lake Ka-Ho*, the court affirmed the exclusion of evidence concerning siltation which occurred in a lake in the defendants' subdivision. The plaintiff condemned certain portions of the defendants' properties to accomplish construction of Interstate Route No. 55 through Macoupin County. Heavy rains during construction caused the erosion of earthen dikes upon which the approaches to the overpass were being built. Silt from the dikes flowed into Lake Ka-Ho, causing its meander line to retreat and the defendants' lots no longer fronted on it. The trial court excluded evidence of the damages caused by the siltation on the basis the siltation came from property which was not taken from the defendants by the plaintiff, that is, it came from the approaches to the overpass located about 600 feet to the southeast of the properties taken from the defendants. Thus, the siltation would have occurred even without the taking of the defendants' properties at issue, and it could not have been the direct and proximate result of the taking but, rather, was the result of the construction in the general area. *Lake Ka-Ho*, 98 Ill. App. 3d at 1055.

Although it is true that the part of the Dickes' property taken in this proceeding formed an integral part of the plans to construct an underpass at 75th Street, the damage to the remainder claimed to have been caused by the placement of the dirt fill on the Gallagher & Henry property was not the result of the actual taking of

the elongated triangular-shaped eight-tenths-acre parcel nor that parcel's use as part of the underpass slope. Moreover, the placement of the dirt fill was not part of the tollway project design, nor does it appear from the evidence that the drainage problem created on the remainder by the fill placement amounted to a "taking" rather than a "damaging." As such, defendants' remedy, if any, is a matter for the Illinois Court of Claims. (*Granite City Moose Lodge No. 272 v. Kramer* (1983), 96 Ill. 2d 265, 271-72; *Lake Ka-Ho, Inc. v. Kramer* (1985), 131 Ill. App. 3d 782, 786.) Defendants' citation to *People ex rel. Day v. Progress Insurance Association* (1955), 8 Ill. App. 2d 75, for the proposition that Illinois law favors resolution of the entire controversy in one lawsuit is unpersuasive. *Day* did not involve an eminent domain proceeding, and the general rule set forth therein is clearly qualified by the phrase "wherever possible." 8 Ill. App. 2d at 83.

For the reasons above, evidence tending to show damage to the remainder due to the placement of dirt fill on the Gallagher & Henry property should not be admitted upon retrial.

The Tollway's remaining contention is that it was error for the court to give the jury defendants' non-Illinois Pattern Jury Instruction (IPI) No. 22 over its objection. It read:

> "Where an abutting owner has conveyed property to a public body for highway purposes reserving a right of access via a proposed access road to be built by the public body at a later date, the owner is entitled to recover any damages resulting from changes in the access road, as originally proposed, which are shown by the evidence to have damaged the owner's remaining property."

The Tollway argues the instruction improperly highlighted one particular element of damage which was otherwise covered by IPI instructions: the change in location of the access road.

■■ We agree the instruction unduly emphasized this element of damage. Again, because we have already determined that the cause must be retried, we do not consider the defendants' argument that the Tollway waived this issue.

We agree the instruction as written is a correct statement of the law. (See *People ex rel. Department of Public Works & Buildings v. Mokres* (1974), 28 Ill. App. 3d 422 (in a condemnation proceeding, a change in a point of direct access to a highway from the front of the respondents' house to a distance of nearly two miles via a frontage road is compensable).) However, it was unnecessary in the instant cause and unduly highlighted one element of damage.

At issue in *Mokres* was the damage sustained by them to their reasonable right of access to the public highway. No such damage was claimed here. Rather, the evidence showed the location and construction of the access road created several physical conditions which directly impacted the value of the Dickes' remainder. As to the damage caused to the remainder as a result of these conditions, the jury was fully instructed pursuant to IPI No. 300.11 (Issues—Fee Interest Taken—Fact of Damage to Remainder Contested), No. 300.31 (Burden of Proof—Fee Interest Taken—Fact of Damage to Remainder Contested), No. 300.45 (Measure of Damages to Remainder—Fee Taken—Fact of Damage to Remainder Contested) and No. 300.86 (Remainder—Definition—Fee Case) (IPI Civil Nos. 300.11, 300.31, 300.45, 300.86 (2d ed. 1971)). Consequently, defendants' instruction No. 22 was unnecessary where these IPI instructions fully covered the issue of damage to the remainder. *Rios v. Navistar International Transportation Corp.* (1990), 200 Ill. App. 3d 526; 134 Ill. 2d R. 239.

Instruction No. 22 also unduly highlighted one element of damage, a practice disapproved in *City of Chicago v. Provus* (1953), 415 Ill. 618. In that eminent domain action, the trial court refused an instruction tendered by the defendants which attempted to define specific elements of damage such as the land's reduced desirability for development and the effect of increased traffic caused by the highway improvement. On appeal, the court's refusal to give the instruction was upheld inasmuch as the instruction "tended to give undue emphasis and importance to certain portions of the evidence." (*Provus*, 415 Ill. at 625.) An instruction which was "abstract, and singled out and unduly emphasized the limitation of access as an element of damage" in the eminent domain action in *Department of Public Works & Buildings v. Maddox* (1961), 21 Ill. 2d 489, 494-95, was also found to have been properly refused.

For the reasons above, the judgment of the circuit court of Du Page County is reversed and the cause remanded for further proceedings consistent with our opinion.

Reversed and remanded.

INGLIS and NICKELS, JJ., concur.