No. 2-08-0593     Filed: 7-26-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF WOODRIDGE, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05--ED--64 |
| | ) | |
| THE BOARD OF EDUCATION OF | ) | |
| COMMUNITY HIGH SCHOOL | ) | |
| DISTRICT 99, | ) | |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| (The County Board of School Trustees of | ) | Honorable |
| Du Page County and Unknown Owners, | ) | John T. Elsner, |
| Defendants). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the opinion of the court:

Defendant, the Board of Education of Community High School District 99 (hereinafter defendant or the district), appeals the Du Page County circuit court's order denying the traverse and motion to dismiss[1] (hereinafter the traverse) it filed in response to an eminent domain proceeding initiated by plaintiff, the Village of Woodridge (hereinafter plaintiff or the village), as well as the court's denial of its subsequent motion to reconsider that order. The district also appeals the denial

---

[1]A traverse and motion to dismiss is a procedural device that the target of an eminent domain proceeding may file to challenge the right of the condemnor to take the property at issue. Village of Cary v. Trout Valley Ass'n, 282 Ill. App. 3d 165, 169 (1996).

of its posttrial motion. The district raises a number of issues relating to both the traverse and the valuation of the property taken by the village. A number of school districts have filed a brief as amici curiae, which we have reviewed and considered. For the reasons that follow, we affirm.

## I. BACKGROUND

The instant case commenced when the village filed an eminent domain action on May 23, 2005. The village sought to acquire a parcel (hereinafter the property) adjacent to its village hall and owned by the district. The district, whose territorial boundaries lie within seven municipalities, acquired most of the property in 1967 in a voluntary, negotiated sale. It subsequently acquired the balance of the property in 1995 in a land swap with the village. When the parties made this agreement in 1995, they included a provision that would require the village to grant the district a special-use permit for the property. In 1971, the district and the Woodridge Park District entered into an agreement under which the park district leased the property for park and recreation purposes. The lease was for a one-year term, and it automatically renewed each year. The district could terminate the lease with 60 days' notice.

On August 15, 2005, the district adopted a resolution regarding its need for the property. The resolution provided, inter alia, that the property is "necessary, suitable and convenient for school facilities"; that the taking "will materially impair or interfere with the uses already existing, such current uses including but not limited to providing for outdoor educational opportunities and the real estate needs of the district;" that the district will be deprived of the ability to use the property in the future for school facilities; that the district will not realize full value of the property in an eminent domain action; that the district will not be able to purchase comparable property with the proceeds of an eminent domain action; and that the "future taxable value of the [p]roperty will be lost." The

district asserts that we owe deference to the legislative findings it made in the course of adopting the resolution.

During the hearing on the traverse, the following evidence was presented. The village first called Julia Beckman, who was the president of the district. She acknowledged that the district had solicited bids for the property, through a company called Newcastle. She agreed that the district had "potential uses for the property," and she explained that the district had drawn up plans for athletic fields. It had "studied various uses for the property," but it "had no money." Previously, it had planned to build a third high school on the site, but that was not an "immediate option" due to the failure of a referendum in 1997. She agreed with the village's counsel that "there weren't any particular plans in place and there were just potential uses for the property in May 2005." Beckman was unaware of any school-sponsored educational activity that had ever taken place on the property, though one was planned for the summer of 2007. To her knowledge, the property had never been used for any classes. She testified that the district lacked classroom space, as the State continued to mandate new classes. Beckman stated that she was aware of the opinion of the district's superintendent that the district could accommodate "a few hundred more students." She agreed that, "narrowly construed," the opinion was valid. She was also aware of Dr. John Casarda's demographic report, which concluded that enrollment was at a peak and would decline through 2020. She was aware of no study that concluded otherwise. Beckman further testified that the district would be unable to purchase an acceptable replacement if it received the fair market value of the property. On the other hand, she agreed that the proceeds from a sale of the property could be used to meet "significant needs for capital improvement." The district had considered selling the property.

During cross-examination, Beckman testified that she was a realtor and was familiar with the local market. Though the district considered selling the property, it had never decided to do so. It had never determined that the property was "surplus." The property itself could not be replaced, as there was no comparable property within the district. She also testified that, in 1997, the district had voted to construct a third high school on the property. She noted that the mere fact that a third high school was not currently a possibility did not foreclose building one in the future. Beckman explained that the reason bids were solicited for the property in 2005 was to ascertain its value. She believed that it was better to solicit bids than to simply get an appraisal, because the property was unique and previous appraisals "just didn't seem to capture its uniqueness." During redirect examination, Beckman agreed that the effect of the condemnation concerned "the future use of the property"--uses that "may or may not occur." She acknowledged that her real estate practice consisted primarily of single-family residences and that she had never sold a parcel the size of the property. Further, one of the purposes of having Newcastle determine the value of the property was to see if it was high enough to warrant a sale.

The village next called Dr. David Eblen, the superintendent of the district. Eblen denied that the district had no intention of seeking another referendum to construct a third high school, though he agreed that the district had no specific plan to do so as of May 2005. Previously, there had been three similar referendums, the most recent occurring in 1997, and all three had failed. Eblen agreed that the district did not have the resources to fund such a project. Moreover, the district had never made a decision to develop the property or otherwise use it to meet the district's needs. Eblen acknowledged that the district solicited bids for the property to establish a value so the district could determine whether to sell it and that the district was still considering selling the property. Eblen

identified an e-mail authored by him that stated, "the Community High School District 99 Board of Education has agreed to offer for sale and solicit bids for the district's 44 acre parcel land [sic] located in Woodridge." The e-mail (which was released as part of Newcastle's marketing effort) stated that the district was selling the property to fund capital improvement projects. The marketing release also quoted the district's comptroller as stating that, due to a 2004 study of projected growth in the district, it was determined that a third high school was unnecessary. The release also stated that a majority of the district's constituents believed that the property should be sold.

During cross-examination, Eblen explained that there had been a recent school board election where three incumbents were reelected. All three were opposed by candidates who advocated selling the property. He explained that, though he believed that the district could absorb a "couple of hundred more students," it would be difficult in that it would require "classes to be held in less than appropriate areas." Eblen noted that the first line under the heading in the solicitation for bids stated that the district was not obligated to accept any of the bids it received (he later agreed that this was a standard reservation in the district's solicitations for bids). He added that the fact that the district had determined what it would do with the proceeds of a sale did not mean that it had actually decided to proceed with a sale. Eblen identified plans an architectural firm had drawn up for athletic fields on the property. The district never went ahead with this work due to the "incredible amount of capital" needed. Eblen further testified that the district had never determined that the property was not needed. During redirect examination, Eblen acknowledged that he was unaware of any "outdoor educational activities" or classes taking place on the property. He had, however, heard that it had been used for classes--though he had no personal knowledge to that effect.

The next witness called by the village was Theresa Pavesich, a member of the district's board. Pavesich voted for the district's resolution regarding the need for the property. She explained that Casarda's enrollment projections were only one factor she considered in voting for the resolution. She had not independently ascertained whether there were any viable replacement properties within the district. She agreed that the district had no present need for a third high school. Pavesich testified that she was unaware of any use to which the property was put, with the exception of uses by the village. In May 2005, the district had no "specific use [to which] it intended to put the property." During cross-examination, Pavesich stated that the lawsuit by the village was a factor in her voting for the resolution. She also testified that a "band camp" was scheduled to take place on the property in August 2007. Finally, Pavesich stated that the district had never determined that the property was not needed.

Michael Adams next testified for the village. He is the director of parks and recreation for the Woodridge Park District. He has held that position since 2006 and has been employed by the park district since 1990. In 1991, Adams was charged with creating a conceptual master plan for use of the property for park district purposes. In 2004, the park district and the village hired Hitchcock Design Group to prepare a conceptual master plan for the town-center area, which included the property. The park district leased the property from the district. The lease allows the park district to use the property for parks, recreation, and park services. The park district maintains the property. The property is used for soccer practices, hay wagon rides, garden plots, a mulch site, and special events, such as the "summertime jubilee." The park district operates a soccer league that is open to nonresidents. Further, a person does not have to be a resident of the park district to have a garden plot. The mulch site and the summertime jubilee are organized jointly by the park district and the

village. Approximately 10,000 people attend the summertime jubilee, which has been held since 1984. People also use the property for "passive park use," such as picnicking, walking, or playing frisbee. Adams later clarified that a passive park use is an actual physical use of the property, that is, there is actually someone on the property using it. Any member of the public can use the property in this fashion. Adams testified that he observes the property on a daily basis and has never seen the district using it. Adams also stated that he expects no adverse impact from the village's taking of the property and that there would "actually [be] an enhancement in the development of that site."

During cross-examination, Adams acknowledged that portions of the park district lie outside the district. The lease, which goes back to 1971, can be cancelled with 60 days' notice. In 1991, the park district became interested in obtaining a longer-term commitment regarding the property so it could expend resources on longer-term projects. A report from the Hitchcock Design Group indicated that the district's needs would have to be considered. Adams told Hitchcock that he was unaware of any potential needs that the district might have. He made no effort to get any input from the district. Adams agreed that building a third high school or athletic fields on the property would comport with the park district's developmental plan. Adams denied any knowledge regarding the purpose for which the district was holding the property.

The village next called John Perry, the administrator for the village. He testified that he had held that position since 1989. His job is to administer the "[v]illage government on a day to day [sic] basis." He also has a role in "strategic management." Perry has a degree in public administration from the University of Chicago and is credentialed by the International City/County Management Association. Perry is familiar with the property. From 1992 to 2000, he coached a soccer team there. Perry recounted the activities the park district conducted on the property. He had never observed

or been made aware of any formal uses of the property by the district. The village intends to ensure that the existing uses of the property continue and, perhaps, are enhanced. Perry testified that the relationship between the village and the park district was "probably one of the outstanding governmental cooperation arrangements that you will find anywhere." Perry added that the existing uses of the property would be allowed to continue after the village acquires the property. Use of the property is not restricted to village residents, and Perry did not expect that it would be so restricted in the future.

Perry also testified that the village had had discussions with the district regarding the property. The village believed that the district would make a decision regarding the property in 2004 or 2005. The district, however, did not do so. Instead, the property was "put on the market for development as multi-family townhomes." This prompted the village to "involve itself more actively in proposed acquisition of the subject property." Perry stated that developing the property for multifamily housing or any use other than that which has been planned by the village would be detrimental to the village's residents. The village has included the property in its plans for its town center since 1971.

During cross-examination, Perry agreed that, at numerous points in planning for the use of the property, it had been recognized that the property might be used for a third high school. In 1999, he attended a meeting at the high school administrative center regarding developing the property with athletic fields. At the meeting the district sought funds from other parties for this purpose. Perry met with Eblen in 2004 to discuss establishing a process by which the village could purchase the property. On April 15, 2005, the district and the village met. The village was dissatisfied with the district's failure to make a decision with regard to the property. The village "didn't agree with the process that [the district] wanted to follow." It requested good-faith progress by April 19. The village also

wanted the district to take the property off the market. The district offered a long-term lease, but that was not acceptable to the village as it would preclude certain investments in the property. Perry acknowledged that a potential use of the property would be expansion of other village facilities; however, he later clarified that such expansion would not preclude public use of the property.

The village rested after the conclusion of Perry's testimony. The district moved for a directed finding. The trial court denied that motion. The district then called Robert Lemke.

Lemke testified that he is a member of the district's board. He was first elected in 2003. The district had never determined that it did not need the property or that the property constituted a surplus. Instead, it adopted a resolution reaffirming the need for the property. The property has been the subject of discussion between the district and the village since before Lemke was on the board. Lemke opined that the district retaining ownership of the property best served the community in that it allowed the district to serve its current and future needs without being required to acquire new property at premium prices. Lemke explained that the district solicited bids for the property in 2005 to ascertain its market value in order to determine what to do with it.

During cross-examination, Lemke acknowledged that a 2004 survey indicated that a majority of the district's residents believed that the district should sell the property. Lemke stated that plans existed regarding the property in 2005; however, he added that the district had taken no action to "move on any one of those plans." He acknowledged that, after the distirct determined the value of the property by soliciting bids, selling it was "certainly one of the possible next steps."

The district next called Allyn Barnett, another member of the district's board. He had held that position since 2005 and had previously sat on the boards of two other school districts. He has been on a school board for 20 years. Barnett testified that the district never declared either formally

or informally that the property is not needed or is unsuitable for school purposes. The subject had, however, been discussed frequently. Barnett voted for the resolution regarding the district's need for the property because he did not wish the village to take the property through an eminent domain action. He believed that there was an "apparent need" for the land. He felt that the district's current facilities were inadequate. Barnett understood that the property was being held for either the construction of a third high school or athletic fields. Barnett opined that there was adequate substitute property within the district, and he identified a potential site. He added that attempts to acquire property around one of the district's high school campuses had proved "extremely costly."

Barnett was asked on cross-examination whether he was aware of the district's attempt to market the property. He replied that he was aware of the attempt to establish its value, but he could identify no specific question that would be answered solely by knowing the value of the property. Barnett acknowledged that he was unaware of any outdoor classes taking place on the property. Barnett agreed that there might be a price at which the district would sell the property (he later clarified that he was not aware what that price would be). While Barnett had been a board member, "no specific use of the property had been decided upon." This was because the district "didn't have the money to do that." During redirect, he explained: "[O]bviously there are needs that could be addressed by the property but have there been any specifics that have been determined? That was what I was answering 'no' to." He also opined that "academic and athletic" facilities "could be put on the property" and that the loss of the property would result in an "inability to use that property to meet those needs" and thus would be detrimental to the public. However, no specific plans currently existed.

The district next called Megan Schroeder, a realtor who typically deals with residential property and is familiar with large tracts of land. She has also been a member of the district's board since 2003. The board has never determined that the property is not needed or is inconvenient for school purposes. Schroeder testified that the district's "existing use of the property" was that it was "being held to answer the needs of the schools, whether it be for athletic [use] or for building a third high school or for *** building [some] other *** kind of a facility." She added, "[W]e're holding on to it, hoping that some day we [will] be able to financially use it." She voted for the resolution regarding the district's need for the property, because she believed that it would be detrimental for the village to take it. She explained that "we were finally poised in a position where we were able to look at what we really needed for the schools and to determine the value" and "answer the needs of the whole community." Schroeder testified that bids were solicited for the property because it was unique. An appraisal, on the other hand, would "be based on past sales and it wouldn't be reflective of what the market is today." Schroeder, being familiar with the area by virtue of her being a realtor, did not believe that suitable replacement property existed within the district. She stated that the district is "woefully low in property."

During cross-examination, Schroeder acknowledged that the district had acquired some property adjacent to one of its campuses, but she pointed out that it was a much smaller area than that of the property. She stated that she had no "definitive answers" with regard to the district's needs. She agreed that "a few hundred more students" could "fit in the building," but added that it would not be desirable. Outside of the band camp that was to use the property in the summer of 2007, Schroeder was not aware of any outdoor educational activity that took place on the property. During redirect examination, Schroeder noted the possibility that the population of the district would grow.

She also pointed out that during one year, the Catholic schools raised their tuition, and, as a result, the district had an increase in enrollment of 160 students. A larger student body would increase the need for the property.

The last witness called by the village was Mark Staehlin, the district's comptroller. He testified that he is "basically the chief financial officer of the district." He has held this position since 1994. Staehlin testified that the property was purchased from private landowners in the late 1960s. Staehlin identified the "Downers Grove north and south high school masters facility plan." The plan included a provision to build a third high school on the property. A referendum to issue bonds for this purpose failed in 1997. The district also contemplated using the property for soccer fields. A 2004 referendum concerning an operating rate increase also failed. In 2004, the district requested its architect to update plans for a sports complex. Staehlin considered various options concerning the property, including selling it in its entirety, developing the whole parcel, or breaking it up into smaller units that could be developed or sold off independently. Another potential use that was discussed was a transportation facility, which would reduce the cost of busing students. Staehlin testified that Newcastle solicited bids for the property in an effort to ascertain its value. Regarding the band camp that was to be held on the property, Staehlin stated that it was the idea of an associate principal from the district's southern campus. According to Staehlin, as of May 2005, the district's existing use of the property was holding it for future use.

During cross-examination, Staehlin acknowledged that one possible outcome when Newcastle marketed the property was that it would be sold (he clarified on redirect that the district wanted to reserve the right not to sell the property). He agreed that from 1994 until 2005, the district had the

financial resources to build athletic fields on the property. Staehlin also testified that no one had ever told him that the district could not continue to hold a band camp on the property after the taking.

After the submission of certain documentary evidence, the district rested. The district called Perry in rebuttal, and he testified that a transportation center would ruin the prospect of using the property as the "hub of the town center." After argument by the parties, the trial court ruled. The trial court first noted that the statute it had to apply, section 11--61--2 of the Illinois Municipal Code (Code) (65 ILCS 5/11--61--2 (West 2004)), was not ambiguous and did not need to be construed. Thus, the inquiry before it was whether the taking would materially interfere with an existing use or would be detrimental to the public. The trial court noted that the public had rejected the referendums that would have allowed the construction of a third high school on the property. It also observed that the property had been leased to the park district for over 30 years, and it found that the district had never used it for an "existing educational purpose." The trial court stated that its role was not to determine the best use of the property; rather, it was limited to applying the statute. The court then found that there was "no present use of that property." Accordingly, it ruled that the taking would not materially interfere with an existing use. It further determined that the taking would not be detrimental to the public.

In addition to disputing the trial court's ruling on the traverse, the district also contests two evidentiary rulings that the trial court made in the course of the hearing on just compensation. We will not set forth in detail the testimony presented at that hearing; instead, we will discuss the evidence only as it pertains to those two rulings. We now turn to the district's arguments.

II. ANALYSIS

-13-

On appeal, the district raises five main arguments. First, it contends that the trial court should not have intervened and resolved the competing legislative determinations made by the village and the district, asserting that this question is not justiciable. Second, it argues that the trial court erred in denying the district the same discovery that it allowed the village. Third, it contends that the taking was not authorized under section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)). Fourth, it complains of the trial court's decision to limit cross-examination of the village's appraisers regarding an offer to buy the property that was made to the district after the village instituted this action. Fifth, it alleges error in the trial court's refusal to permit one of its appraisers to testify in the just-compensation hearing. We will address these arguments in turn.

As a threshold matter, we will accept the trial court's factual findings unless we determine that they are contrary to the manifest weight of the evidence. Chicago Investment Corp. v. Dolins, 107 Ill. 2d 120, 124 (1985). A decision is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. Vino Fino Liquors, Inc. v. License Appeal Comm'n, 394 Ill. App. 3d 516, 523 (2009). Questions of law, including matters of statutory construction, are reviewed de novo. LaSalle Bank National Ass'n v. Cypress Creek 1, LP, 398 Ill. App. 3d 592, 597-98 (2010). Decisions lying within the discretion of the trial court, such as the admission of evidence, will be reversed only if the trial court abuses that discretion. U.S. Bank v. Lindsey, 397 Ill. App. 3d 437, 456 (2009). An abuse of discretion occurs only where no reasonable person would take the trial court's view. Bauer v. Memorial Hospital, 377 Ill. App. 3d 895, 912 (2007).

## A. Whether This Case is Justiciable

The district first contends that this case is not justiciable because it requires the court to resolve two competing legislative determinations. The district first correctly points out that a

municipality has no general authority to condemn public land and that a municipality may take public land only when a statute expressly authorizes it. City of East Peoria v. Group Five Development Co., 87 Ill. 2d 42, 45 (1981). As we discuss later, however, that express grant of power is found in section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)). The district continues that, in a normal eminent domain action where the condemnee is not a governmental body, the condemnor's determination that the taking is necessary establishes a prima facie case of authority and need. Trustees of Schools of Township No. 37 v. First National Bank of Blue Island, 49 Ill. 2d 408, 414 (1971). It notes that such a legislative determination is presumed to be valid and that the party challenging the enactment bears the burden of rebutting the presumption. City of Chicago v. Pooh Bah Enterprises, Inc., 224 Ill. 2d 390, 406 (2006); Poole v. City of Kankakee, 406 Ill. 521, 533 (1950). The district further points out that, in addition to the village's ordinance initiating the condemnation, the district passed a presumptively valid and competing resolution.

The district then argues that the court system now faces a situation where it is required to choose between two competing legislative enactments and to choose which public need is greater. It contends that the trial court essentially sided with the village and determined that the village's needs were more compelling than those of the district. This issue, according to the district, is a political question beyond the power of the judiciary. Further, the district asserts, as there is no justiciable controversy, subject-matter jurisdiction is lacking. People v. Capitol News, Inc., 137 Ill. 2d 162, 169-70 (1990). We disagree.

The political-question doctrine is a recognition of the separation of powers between the various branches of our system of governance. Roti v. Washington, 148 Ill. App. 3d 1006, 1009 (1986), quoting Baker v. Carr, 369 U.S. 186, 210, 7 L. Ed. 2d 663, 682, 82 S. Ct. 691, 706 (1962).

Questions that " 'lack of satisfactory criteria for a judicial determination' " and for which it is appropriate to attribute " 'finality to the action of the political departments' " are beyond the jurisdiction of the judicial branch. Committee for Educational Rights v. Edgar, 174 Ill. 2d 1, 28 (1996), quoting Baker, 369 U.S. at 210, 7 L. Ed. 2d at 682, 82 S. Ct. at 706. Neither criterion applies in the instant case.

This case is governed by section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)), which provides:

"The corporate authorities of each municipality may vacate, lay out, establish, open, alter, widen, extend, grade, pave, or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks, and public grounds; and for these purposes or uses, to take real property or portions thereof belonging to the taking municipality, or to counties, school districts, boards of education, sanitary districts or sanitary district trustees, forest preserve districts or forest preserve district commissioners, and park districts or park commissioners, even though the property is already devoted to a public use, when the taking will not materially impair or interfere with the use already existing and will not be detrimental to the public." 65 ILCS 5/11--61--2 (West 2004).

Thus, there are clear criteria for the court to utilize to resolve this case. Specifically, the court must determine whether the property is committed to a public use and whether the taking will materially impair an existing use or be detrimental to the public. See 65 ILCS 5/11--61--2 (West 2004).

Moreover, the legislature enacted this statute, thereby creating these criteria. Since the legislature has directed us regarding how to resolve this issue, it is difficult to discern, so long as we follow the statute, how our resolving this dispute would impermissibly intrude into the realm of the

legislature. In other words, since the legislature has set forth criteria for resolving <u>future</u> disputes, its actions are not of a <u>final</u> nature.

Further, contrary to the district's suggestion, there is no occasion for us to defer to the legislative enactments of the units of local government involved in this case. Units of local government are creatures of the legislature. See <u>La Salle National Trust, N.A. v. Village of Mettawa</u>, 249 Ill. App. 3d 550, 575 (1993) ("It is universally recognized that municipal corporations are creatures of the State and that, absent constitutional restraints, municipal corporations are subject to the will and discretion of the legislature"). With the exception of home rule, the authority of units of local government is dependent "upon the legislature, and, without a grant of power, the local government could not act." <u>Groenings v. City of St. Charles</u>, 215 Ill. App. 3d 295, 303 (1991). In fact, our state's constitution expressly provides that school districts "shall have only powers granted by law." Ill. Const. 1970, art. VII, §8; see also <u>Best Bus Joint Venture v. Board of Education</u>, 288 Ill. App. 3d 770, 778 (1997). The proper role of the court system is "construing the constitution and determining whether its provisions have been disregarded by any of the branches of government [citation] and to interpret[] the laws of the state." <u>Bigelow Group, Inc. v. Rickert</u>, 377 Ill. App. 3d 165, 174 (2007); see also <u>Murneigh v. Gainer</u>, 177 Ill. 2d 287, 302 (1997) ("The legislative function of enacting general laws and the executive function of enforcing those laws are complemented by the judicial function of interpreting and applying laws in specific cases"). In section 11--61--2 of the Code, the legislature authorized a municipality to take land belonging to a school district. Given the judiciary's traditional role in interpreting and applying statutes, it is difficult for us to see how we would be intruding into matters properly committed to another branch of government by interpreting and applying section 11--61--2. Moreover, as that section provides no role for the governing body

of the condemnee in determining whether a taking should go forward, if we were to defer to the district's legislative findings, we would be abdicating our established role in our system of governance. Indeed, the district's resolution--if allowed to control this case--would strike us more as an encroachment upon judicial authority. See Kujawinski v. Kujawinski, 71 Ill. 2d 563, 570-71 (1978).

The district contends that the legislature has "expressly entrusted" it to determine whether a taking will be detrimental to the public. In support of this assertion, it points to section 10--22.13 of the School Code (105 ILCS 5/10--22.13 (West 2004)), which empowers a school board to "decide when a site or building has become unnecessary, unsuitable or inconvenient for a school." Statutes, if possible, must be construed using their plain language, and a court must not read into a statute an exception, limitation, or condition that the legislature did not express. Gallagher v. Union Square Condominium Homeowner's Ass'n, 397 Ill. App. 3d 1037, 1041 (2010). While this statute clearly vests a school board with the authority to make such a determination, nothing in its language suggests that it was intended to divest a court of authority over disputes arising under section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)). Indeed, it would be odd for the legislature to vest one of the parties to a dispute with the power to determine its outcome. We do not find the district's position persuasive.

The district also points out that the legislature "has established an alternate mechanism that allows the [v]illage to accomplish its goal of complete divestment without threatening the independent political authority of the [district]." Here, the district refers to section 5--24 of the School Code, which states:

"Whenever a petition is presented to the school board of a school district requesting the sale of school grounds and buildings to another school district or other municipality,

which petition is signed by 10% of the voters of the district, the school board of the district shall adopt a resolution for the sale of such school grounds and buildings, and fix the price therefor, and shall thereupon order the secretary to certify to the proper election authorities the proposition for submission to the voters of the district in accordance with the general election law; and if a majority of the votes cast upon the proposition are in favor of the sale, then the school board, trustees of schools of the township in which the school district is located, or other school officials having legal title shall convey by its president and clerk or secretary, upon receipt of the purchase price, the property so to be sold; and the purchase price thereof shall be placed with the proper treasurer for the benefit of the school district so selling the property." 105 ILCS 5/5--24 (West 2004).

We agree with the district's characterization of this as an "alternate mechanism" and see nothing in this statute intended to prevent the village from proceeding under section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)) or to preclude the judiciary from entertaining such an action. Indeed, since section 11--61--2 expressly authorizes a municipality to proceed with a condemnation of land already held for public use, section 5--24 is clearly an alternative.

In sum, we conclude that the present case presents a justiciable matter. It does not call for the court system to resolve competing legislative determinations. Our role is limited to considering the issues that the legislature set forth in section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)).

B. Whether the Trial Court Improperly Limited Discovery by the District

The district next asserts that "[o]nce the Circuit Court determined that it would choose between competing legislative determinations of public need, the [district] sought to discover the

factual basis of the [v]illage's determination that the public need required the taking of the [p]roperty for a park." It therefore sought to depose the village's mayor and members of the village board. It also requested certain documents. The district complains that the trial court denied it this discovery even though it granted similar discovery to the village. During the hearing on the district's motion to compel discovery, the district acknowledged that it was not contending that the village sought the property for an impermissible purpose; rather, it was questioning whether the statutory requirements had been met.

We conclude that the trial court did not abuse its discretion in denying the district's request. The trial court apparently determined that the evidence sought by the district was not relevant to anything properly provable at trial. The village points out that this court has previously held that it would be difficult to find an abuse of discretion regarding the denial of a discovery request where the requested material is not relevant. Estate of Heanue v. Edgcomb, 355 Ill. App. 3d 645, 651-52 (2005) (the district seeks to distinguish Heanue because the discovery request it addressed was not timely; however, that clearly was an alternative basis for our ruling in that case (see Heanue, 355 Ill. App. 3d at 651-52)).

As we explained above, it was not the trial court's role to "choose between competing legislative determinations of public need." Rather, this case required the trial court to apply section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)). That section required the trial court to inquire into whether the taking would materially interfere with an existing use or be detrimental to the public. It does not require a court to assess the sufficiency of the ordinance with which the condemnor initiated the taking. As such, a reasonable person could agree with the trial court that the

material sought by the district was not relevant and, therefore, no abuse of discretion occurred. Bauer, 377 Ill. App. 3d at 912.

Moreover, even if the trial court's decision on this issue was erroneous, the district was not prejudiced by it. In the course of ruling on the district's traverse, the trial court expressly noted its role, taking into account separation-of-powers concerns, and stated that it had "no opinion as to what the best use of the property is." Rather, it recognized that it was to apply section 11--61--2 as written by the legislature. At no point in its ruling did it place any reliance on the village's ordinance authorizing the condemnation. As the trial court did not rely on the village's ordinance in making its ruling, any error limiting the district from investigating the basis for the ordinance was harmless. Cf. People v. Crews, 122 Ill. 2d 266, 288 (1988) (holding that the erroneous admission of a victim impact statement at a sentencing hearing was harmless where the trial court did not rely on the statement in sentencing the defendant).

C. Whether Section 11--61--2 of the Code Authorizes the Taking

The district next contends that the condemnation was not authorized by section 11--61--2 (65 ILCS 5/11--61--2 (West 2004)). This statute has yet to be construed in a manner pertinent to this case. The district raises a number of subarguments in support of its position. We will address them in turn.

The district first contends that the use the village proposes to make of the property is not one of the uses set forth in the statute. The statute provides, in pertinent part, as follows:

"The corporate authorities of each municipality may vacate, lay out, establish, open, alter, widen, extend, grade, pave, or otherwise improve streets, alleys, avenues, sidewalks,

-21-

wharves, parks, and public grounds; and for these purposes or uses, to take real property or portions thereof belonging to *** school districts." 65 ILCS 5/11--61--2 (West 2004). The district contends that the evidence indicates that the village intends to use the property to expand its facilities, including its police and public-works facilities. Granting, arguendo, that this is the use the village intends to make of the property, this proposed use is not outside the scope of section 11--61--2. We turn to the plain language of the statute for guidance, as it is the best indication of what the legislature intended when it enacted the statute. Abruzzo v. City of Park Ridge, 231 Ill. 2d 324, 332 (2008). The provision authorizes a municipality to take property to "otherwise improve *** public grounds." 65 ILCS 5/11--61--2 (West 2004). "Improve" is defined as "[t]o develop (land), whether or not the development results in an increase or decrease in value." Black's Law Dictionary 761 (7th ed. 1999). Further, we perceive of no reasonable construction of "public ground" that would exclude the property. As such, section 11--61--2, by virtue of its plain language, authorizes a municipality to take land held by certain governmental entities in order to develop it. Hence, the village's intended use of the property is within the scope of section 11--61--2.

The district reiterates its argument that the trial court failed to grant appropriate deference to its legislative findings encompassed in the resolution it adopted on August 15, 2005. As we explained above, the statutory scheme the legislature set forth to govern such takings provides no occasion for a court to defer to the legislative findings of a condemnee. The judiciary's role in this case is to apply section 11--61--2, not to choose between two competing legislative enactments. In the course of making this argument, the district refers to three factual matters that were also encompassed in the district's resolution. Though the resolution itself is not entitled to any weight under section 11--61--2, we will nevertheless comment on these underlying factual issues. First, the

district charges that the trial court did not understand that the property could generate property tax revenue for the district even if it was not conveyed to a private entity. For example, the district points out that it could lease the property for a use that is subject to taxation. While there are certain scenarios where this would be true, we believe it too speculative to have any bearing on the outcome of this case. Second, the district complains that the trial court rejected its claim that it would not receive full compensation for the property in an eminent domain proceeding. In an eminent domain action, the jury is instructed to award the condemnee the fair market value of the property. See Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co., 196 Ill. App. 3d 5, 19 (1990). If the jury fails to do so, a condemnee's recourse is to appeal the verdict. As such, the trial court properly rejected the district's argument on this point. Third, the district complains of the trial court's reliance upon evidence indicating that it did not need and could not secure funding for a third high school. It claims that such matters are beyond the purview of the court system. See Committee for Educational Rights, 174 Ill. 2d at 24 ("Historically, this court has assumed only an exceedingly limited role in matters relating to public education, recognizing that educational policy is almost exclusively within the province of the legislative branch"). While we would generally agree, the legislature has, in section 11--61--2 of the Code, enacted a statute committing to the courts the question of whether a taking would be detrimental to the public. Accordingly, the district's resolution notwithstanding, we find the district's assertions ill founded.

The district next contends that the taking materially interferes with existing uses of the property. The trial court found that the district had not put the property to any existing use and that the property had been leased by the park district for over 30 years. The district posits two existing uses for the property. It contends that holding the property for a future use constitutes an existing

use and that holding the property as an investment is also an existing use. Amici curiae join the district on these points. We find neither contention persuasive.

The notion that holding the property for a future use is an existing use conflicts with the plain language of the statute. Quite simply, section 11--61--2 directs that a taking of publicly held property may take place only where it "will not materially impair or interfere with the use already existing" of the property sought to be condemned. (Emphasis added.) 65 ILCS 5/11--61--2 (West 2004). "Existing" is the present participle of "exist." Webster's Third New International Dictionary 797 (2002). "Exist" means "to have actual or real being whether material or spiritual: [to] have being in space and time." Webster's Third New International Dictionary 796 (2002). Further, "already" is defined as "prior to some specified or implied past, present, or future time" and it is usually "used to refer to time that is past with respect to the verb modified or to a condition that has been reached prior to the time of observation." Webster's Third New International Dictionary 62 (2002). Thus, the legislature used a word of the present--"exist"--and added emphasis to it by modifying it with the term "already." Accordingly, we cannot agree that holding for a future use constitutes a "use already existing" within the meaning of the statute.

Moreover, the district's interpretation would all but render section 11--61--2 a nullity. After all, if one is holding something and not using it currently, it must be for a use in the future. Generally, "To determine the legislature's intent, we may also consider the reason, necessity, and purpose of the law, as well as the consequences that would result from construing it one way or another." In re Detention of Welsh, 393 Ill. App. 3d 431, 446 (2009). A construction that renders a statute meaningless should be avoided. In re Marriage of Kates, 198 Ill. 2d 156, 167 (2001). Construing "use already existing" as encompassing holding for a future use would allow a condemnee to thwart

a taking on the slenderest of grounds. In essence, a taking could go forward only where the condemnee could set forth no possible future use of a parcel. The legislature, however, presumably intended municipalities to be able to condemn publically held land or it would not have enacted section 11--61--2. We will not eviscerate that intent by ignoring the connection to the present indicated by the phrase "already existing" and reading the language of the statute in an unnatural manner.

The amici curiae set forth substantial argument on this point. Their arguments are largely driven by matters of policy. For example, they contend that the trial court's decision "does not factor in political realities of the deliberative process." They also assert that if the trial court's ruling is allowed to stand, "no school board will be able to properly plan for the future needs of its students." This latter concern strikes us as overstated. We see little reason to suspect that municipalities will suddenly go on a condemnation spree, seizing vast amounts of property from school districts across the state. The fact that a municipality has to pay fair market value in a condemnation will surely act as a limit upon the amount of property that municipalities will condemn. In any event, such concerns are best directed to the legislature, which can amend the statute if it deems doing so appropriate.

The district also contends that holding the property for an investment constitutes an existing use. It begins by pointing out certain policy considerations, such as that real estate is the "only practical form of long-term mid- to high-yield investment" that a school district may make under Illinois law. See 30 ILCS 235/0.01 et seq. (West 2004). It asserts that the lack of liquidity of real estate is also beneficial to school districts, making it "less vulnerable to claims for immediate or short-term use." An eminent domain proceeding, the amici curiae state, would force a school district to

"convert a real estate investment into a highly liquid asset." The district further notes that it is expressly authorized to "provide revenue for schools." 105 ILCS 5/10--20.3 (West 2004).

While there are certainly persuasive reasons for a school district to acquire and hold real estate, the question before us is whether holding real estate as an investment constitutes an existing use. We conclude that it is not. If we were to accept it as an "already existing" use within the meaning of section 11--61--2 (65 ILCS 5/11--61--2 (West 2004)), we would render the statute all but meaningless. We cannot conceive of a situation where any entity holding property could not state that it was holding it for investment purposes. In essence, a condemnation could proceed only with the consent of a condemnee who refrained from making this claim. Condemnation, by its very nature, does not require the consent of a condemnee. Thus, even if holding property for an investment is literally an existing use, we will not construe the statute as encompassing such a use, as that would defeat the intent of the legislature. See In re Estate of Castro, 289 Ill. App. 3d 1071, 1075 (1997) ("[W]here the spirit and intent of the General Assembly in enacting a statutory provision are clearly expressed and its objects and purposes are clearly set forth, courts are not bound by the literal language of a particular clause which would defeat the obvious intent of the legislature"). Clearly, the legislature intended a municipality to be able to condemn publically held land in some circumstances or it would not have enacted section 11--61--2. The district's position on this point would make it virtually impossible for a municipality to do so. Moreover, "invest" is defined, inter alia, as "to make use of with particular thought of future benefits or advantages." Webster's Third New International Dictionary 1189 (2002). Thus, investing implies a connection to the future whereas "already existing" (as explained above) plainly refers to the present. Accordingly, we

determine that holding for investment purposes is not an existing use within the meaning of section 11--61--2.

Next, the district argues that the taking is detrimental to the public within the meaning of section 11--61--2. It briefly contends that the trial court applied the wrong standard in making this assessment; however, it offers no sustained argument or authority on this point, and we will not consider it further. See Girard v. White, 356 Ill. App. 3d 11, 17 (2005). We reject the district's contention that we should consider that, since the district is geographically bigger than the village, the taking will be "on balance" detrimental. Similarly, the district's assertion that residents of the district who are not residents of the village will not benefit from the taking "because they cannot vote in local Woodridge elections" strikes us as not well founded. We fail to see how the inability to participate in an election would preclude an individual from using and enjoying a park. There was testimony in this case that use of the property was not restricted to residents of the village or the park district. As such, there was evidence from which the trial court could conclude that the taking would not be detrimental to the public generally. Moreover, given the plain language of the statute, this is the appropriate standard. The statute states that the taking may occur if it "will not be detrimental to the public." (Emphasis added.) 65 ILCS 5/11--61--2 (West 2004). It does not refer to residents of some particular unit of local government. It is, of course, improper to read into a statute "exceptions, limitations or conditions not expressed by the legislature" (Western & Southern Life Insurance Co. v. Edmonson, 397 Ill. App. 3d 146, 152 (2009)), and we will not do so here.

The district argues that losing the property would "entirely thwart [its] efforts to fulfill current real estate and facility needs because adequate replacement property does not exist." It is undisputed that, as of the time of the hearing below, the district had not used the property for anything (save

holding it for a future use or for investment purposes, which are not existing uses within the meaning of the statute). Moreover, there was evidence that student enrollment was at a peak and was expected to decline through 2020. The district had not used the property when enrollment was at its peak, so it does not follow that it needed it to meet its needs when enrollment started to decline. Moreover, notwithstanding the district's claim that no suitable replacement property exists within the district, Allyn Barnett, a member of the district's board, testified that such property did exist and he identified a specific parcel. Accordingly, we cannot conclude that the trial court erred in finding that the taking is not detrimental.

The district also complains that it will be vulnerable to tax objections and that a "large cash verdict will require additional referenda to maintain existing tax levy limits." Regarding the first point, it is true that "[i]t has long been the fixed policy in this State not to permit the unnecessary accumulation of monies in the public treasury. And while the taxing authorities have reasonable discretion in fixing the amount necessary to be raised, the courts will interfere to prevent a clear abuse of their discretionary powers." Central Illinois Public Service Co. v. Miller, 42 Ill. 2d 542, 543 (1969); see also Geja's Café v. Metropolitan Pier & Exposition Authority, 153 Ill. 2d 239, 263-64 (1992) ("We reaffirm the principle that these cases expound, namely that it is unconstitutional to impose unnecessary taxes"). Thus, the district's assertion regarding tax objectors, at its core, amounts to a claim that it would be detrimental to allow taxpaying citizens to behave in a manner consistent with the public policy of this state. We flatly cannot adopt such a position. Moreover, as the village points out, the district's operating budget for 2008-09 was about $74 million; the jury award in this case was $14.2 million; and much greater surpluses have been upheld. See In re Application of the People ex rel. Anderson, 279 Ill. App. 3d 593, 597 (1996); see also In re Application of County

Collector, 41 Ill. App. 3d 106, 111 (1976) ("[T]he courts have frequently upheld levies despite large cash balances on hand where no improper purpose was shown"). Similarly, the district's second complaint involves the application of the Property Tax Extension Limitation Law (35 ILCS 200/18--185 et seq. (West 2008)). It is difficult for us to conceive of how the application of one legislative enactment could be detrimental to the public as contemplated by another legislative enactment. As such, we find the district's assertions on these two points unpersuasive.

Before closing this section, we note that amici curiae repeatedly attempt to draw a distinction between a municipality condemning an entire parcel and a municipality taking only a portion of a parcel. This distinction is not supported by the statute. Section 11--61--2 allows a municipality "to take real property or portions thereof." (Emphasis added.) 65 ILCS 5/11--61--2 (West 2004). As such, these arguments are not well founded.

In short, we hold that section 11--61--2 authorized the village to condemn the district's property in this case.

### D. Whether the Trial Court Erred in Limiting Cross-Examination
### of the Village's Appraisers

The district next argues that the trial court erred by barring it from cross-examining the village's appraisers regarding an offer to purchase the property by Dartmoor Homes. The trial court denied the district's request to use this offer for impeachment purposes. It first noted that the Dartmoor offer "was not an offer to purchase the property at a specific price," as the offer was comprised of a $10 million base price that increased on a per-unit basis depending on how many residential units were ultimately approved for development. Since no one could testify as to how many homes would ultimately be permitted on the property, the purchase price was speculative. The

trial court also observed that Dartmoor could "back out within 90 days," so the offer was contingent. The parties do not contest the trial court's factual findings here, and we will accept them for the purpose of resolving this appeal.

Generally, the best evidence of the value of a parcel consists of actual sales of similarly situated property in the vicinity of the condemned property. City of Chicago v. Lehmann, 262 Ill. 468, 474 (1914). Absent such evidence, offers to purchase the property provide some evidence of value, "provided such offers are bona fide and are made before the property is condemned." Illinois State Toll Highway Authority v. Dicke, 208 Ill. App. 3d 158, 168 (1991). The village suggests that the offer was not bona fide, but this does not appear to be the basis for the trial court's ruling. Similarly, the parties devote some attention to the timing of the offer relative to the initiation of the condemnation, another factor the trial court did not mention in its ruling. Instead, the trial court's ruling was based upon principles of relevance, noting that the price was speculative and the offer contingent. Evidence is relevant if it "has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " Voykin v. Estate of DeBoer, 192 Ill. 2d 49, 57 (2000), quoting Fed. R. Evid. 401.

As the trial court observed, the terms of the offer included Dartmoor's unconditional right to terminate the agreement within 90 days. Dartmoor's so-called offer, then, was not an offer at all. See McCarty v. Verson Allsteel Press Co., 89 Ill. App. 3d 498, 508 (1980) (noting that "where the so-called offer is not intended to give the so-called offeree the power to make a contract there is no offer"). Further, that the purported offer did not contain a definite price, as it consisted of a base price plus a per-unit price increase, made the offer speculative and severely limited its probative value.

As the trial court identified two valid reasons for its decision, we cannot say that a reasonable person could not agree with the trial court, so no abuse of discretion occurred.  Bauer, 377 Ill. App. 3d at 912.

The district contends, nevertheless, that it should have been permitted to use the Dartmoor offer to impeach the village's appraisers.  In Dicke, 208 Ill. App. 3d at 169, this court concluded that a trial court abused its discretion by admitting an offer to purchase property being condemned where the offer was not made until after the eminent domain proceeding was initiated.  The proponent of this evidence argued that it should be allowed to show the basis for its expert's opinion--in essence, to bolster the expert's credibility.  Dicke, 208 Ill. App. 3d at 168.  This court found it to be reversible error to admit this evidence, even for the limited purpose of the expert's credibility.  Dicke, 208 Ill. App. 3d at 169-70.  We reasoned that, though an appraiser could consider such an offer in its proper perspective, laypeople on the jury likely could not do so.  Dicke, 208 Ill. App. 3d at 170.  That same reasoning applies here and provides an adequate basis for the trial court's exercise of its discretion. The district attempts to distinguish Dicke on the basis that it wished to use the Dartmoor offer for impeachment purposes while, in Dicke, the evidence was used by the proponent of the expert testimony.  However, both uses pertain to credibility and both carry with them the same risk of misuse by the jury.  We find the district's attempt to distinguish Dicke unpersuasive.

Accordingly, we hold that the trial court did not err in excluding evidence of the Dartmoor offer.

E. Whether the Trial Court Erred in Barring One of the District's Appraisers From Testifying

The district also argues that the trial court should have permitted Gary DeClark, one of its appraisers, to testify.  Even if we assume, arguendo, that it was error to bar DeClark from testifying,

we are convinced that any such error was harmless. In <u>Trustees of Schools of Township No. 36 v. LaSalle National Bank</u>, 21 Ill. 2d 552, 557 (1961), our supreme court stated:

> "We have held in other eminent domain actions that where there are other witnesses and evidence as to value on both sides, even the improper admission [citation] or the improper exclusion [citation] of value evidence does not constitute reversible error where the jury has the opportunity of weighing the conflicting evidence admitted on behalf of both sides."

The court reiterated this proposition in <u>Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.</u>, 163 Ill. 2d 498, 505 (1994) ("The law of this State is well established that the improper admission or exclusion of value evidence does not constitute reversible error when there are other witnesses and evidence as to value on both sides and the jury has the opportunity of viewing the property and weighing the conflicting evidence"). In this case, the district presented the opinion testimony of Dale Klezsynski, another appraiser, who valued the property at $21,500,000. DeClark valued the property at $19,690,000. As such, we fail to see how the district suffered any meaningful prejudice from the exclusion of DeClark's testimony.

The district asserts that it was prejudiced because the exclusion of DeClark left it with one witness to testify regarding value while the village had two such witnesses. It provides no authority to support this proposition, thus forfeiting the issue. <u>Novakovic v. Samutin</u>, 354 Ill. App. 3d 660, 667 (2004). We will therefore not consider this argument any further.

### III. CONCLUSION

In light of the foregoing, we hold that the village possessed the authority pursuant to section 11--61--2 of the Code (65 ILCS 5/11--61--2 (West 2004)) to condemn the property held by the

district.  Furthermore, the trial court's evidentiary rulings of which the district complains were not erroneous or were harmless.  Therefore, we find none of the district's contentions of error persuasive, and we affirm the judgment of the circuit court of Du Page County.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.