# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Central Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041

| | |
|---|---|
| Appellate Court Caption | CENTRAL AUSTIN NEIGHBORHOOD ASSOCIATION and AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-12-3041 |
| Filed | November 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A complaint alleging that defendant city's system of responding to 911 calls violated the Illinois Civil Rights Act by having a disparate impact on African-American and Hispanic neighborhoods was improperly dismissed on the ground that it raised only a nonjusticiable political question, since the Act provides sufficient standards to be applied by the court in determining whether the city's system for deploying emergency personnel justifies any disparate impact on African-American and Hispanic neighborhoods, the complaint did not present a nonjusticiable political question and plaintiffs were entitled to discovery on the extent of the alleged disparate impact of the city's system and the justification for that system. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-37299; the Hon. Neil H. Cohen, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Sidley Austin LLP, of Chicago (Richard J. O'Brien, Eric S. Mattson, and Alexis Rollins Dunton, of counsel), for appellant Central Austin Neighborhood Association.

Roger Baldwin Foundation of ACLU, Inc., of Chicago (Harvey Grossman and Karen Sheley, of counsel), for appellant American Civil Liberties Union of Illinois.

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Andrew W. Worsek, Assistant Corporation Counsel, of counsel), for appellee.

Panel

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Justices Pucinski and Mason concurred in the judgment and opinion.

## OPINION

¶ 1    Two organizations whose members include African-Americans and Hispanics sued the City of Chicago (City), alleging a violation of the Illinois Civil Rights Act (Act) (740 ILCS 23/5 (West 2012)), and seeking a change in the way the City responds to emergency calls to 911. The organizations alleged that, on average, persons in neighborhoods populated mostly by African-Americans and Hispanics wait longer than persons in neighborhoods populated mostly by whites for police to arrive in response to a 911 call. The trial court granted the City's motion to dismiss the complaint, holding that regardless of the extent of the systematic disparity in response times, because the complaint raised only a nonjusticiable political question, the complaint did not state a claim for which the court could grant the complainants relief. On this appeal, we hold that the political question doctrine does not divest a court of jurisdiction to address plaintiffs' claim that the City's allocation of resources to respond to 911 calls results in a disparate impact on residents of police districts populated largely by African-Americans and Hispanics, and, therefore, the trial court should not have dismissed the complaint for failure to state a justiciable claim. Accordingly, we reverse the trial court's judgment and remand for further proceedings on the complaint.

¶ 2                                    BACKGROUND
¶ 3    The Central Austin Neighborhood Association and the American Civil Liberties Union of Illinois sued the City, alleging that the City's administration of responses to 911 calls violates the Act. The City filed a motion to dismiss the complaint under section 2-615 of the

Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). The trial court granted the motion on grounds that the complaint raised only a nonjusticiable political question. The plaintiffs now appeal.

¶ 4 Due to the procedural posture of this case, we must accept as true all facts well-pleaded in the complaint. See *Brogan v. Mitchell International, Inc.*, 181 Ill. 2d 178, 183 (1998). According to the complaint, the office of emergency management and communications (OEMC) answers 911 calls and dispatches emergency personnel, including Chicago police officers, to respond to the calls. The City authorizes OEMC to dispatch beat officers only from the police district where the call originated. When a police district no longer has any beat officers available for dispatch in response to a call, the district has radio assignments pending, which the parties refer to as a "RAP" situation. During a RAP situation, OEMC still answers 911 calls, but no officer responds to those calls until an officer becomes available. Districts that have more frequent RAP situations have greater delays in responding to 911 calls. Districts populated mostly by white residents report fewer violent crimes and fewer 911 calls per beat officer, and correspondingly lower response times to 911 calls. Districts populated mostly by African-American and Hispanic residents reported more violent crimes and more 911 calls per beat officer, more RAP situations, and higher response times to 911 calls. Citing an article from the Chicago Sun Times, dated November 22, 2010, plaintiffs alleged that Town Hall, a majority white district, had 17 RAP situations between January 2009 and October 2010, while Chicago Lawn, a district mostly populated by African-Americans and Hispanics, had 885 RAP situations in the same time period. Chicago Lawn had 3.61 violent crimes per beat officer, while Town Hall had 1.63 violent crimes per beat officer.

¶ 5 The complaint included further allegations that the disparate response times for responses to 911 calls, depending on the predominant racial makeup of the police districts, had prevailed in Chicago for 20 years. The plaintiffs sought a judgment declaring that the administration of the 911 system violated the Act and an order requiring the City to submit to the court a plan detailing how the City will "provide equal services in response to 911 calls to minority neighborhoods."

¶ 6 Plaintiffs served discovery requests on the City. The court granted the City's motion to stay discovery pending a decision on the City's motion to dismiss the complaint. In the motion to dismiss, the City argued that the plaintiffs failed to allege a violation of the Act, that they failed to allege that they suffered harm from the alleged practices, and that they raised only a nonjusticiable political question. The trial court held that (1) the Illinois Constitution delegates to the City, and not to the court, the power to organize, fund and control the police force; (2) no judicially discoverable and manageable standards could guide a judicial resolution of the alleged problem; and (3) any court order in favor of the plaintiffs would inextricably involve the court in a policy determination of a kind clearly meant for nonjudicial discretion. Applying the political question standards enunciated in *Baker v. Carr*, 369 U.S. 186, 217 (1962), the trial court found that the complaint raised only a political question, so the court dismissed the complaint. The plaintiffs now appeal.

¶ 8       We review *de novo* the dismissal of a complaint under section 2-615 of the Code. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. The trial court should not dismiss the complaint unless the complaint clearly shows that the plaintiffs cannot prove any set of facts under the complaint that would entitle them to relief. *Simpkins*, 2012 IL 1100662, ¶ 13.

¶ 9       Plaintiffs seek relief under the Act, which provides:

"(a) No unit of State, county, or local government in Illinois shall:

(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender.

(b) Any party aggrieved by conduct that violates subsection (a) may bring a civil lawsuit, in a federal district court or State circuit court, against the offending unit of government. Any State claim brought in federal district court shall be a supplemental claim to a federal claim. This lawsuit must be brought not later than 2 years after the violation of subsection (a). If the court finds that a violation of paragraph (1) or (2) of subsection (a) has occurred the court may award to the plaintiff actual damages. The court, as it deems appropriate, may grant as relief any permanent or preliminary negative or mandatory injunction, temporary restraining order, or other order." 740 ILCS 23/5 (West 2012).

¶ 10      Plaintiffs have alleged that the City, a unit of local government, uses a method of administering responses to 911 calls that has the effect of subjecting the residents of police districts populated mostly by African-Americans and Hispanics to longer waiting periods, on average, for responses to 911 calls. The complaint alleges a violation of the Act. 740 ILCS 23/5 (West 2012). We look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation of the Act. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79 (1989); *Trayling v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 1, 11 (1995). If the court allows the suit to proceed, and plaintiffs can prove their allegations,

"the burden shifts to the City to demonstrate that its policy or practice had ' "manifest relationship" ' to a legitimate, non-discriminatory policy objective and was necessary to the attainment of that objective. [Citation.] If the City shows that its actions were justified, then the burden shifts back to Appellants to show 'a viable alternative means' was available to achieve the legitimate policy objective without discriminatory effects." *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010) (quoting *Darst-Webbe Tenant Ass'n Board v. St. Louis Housing Authority*, 417 F.3d 898, 902-03 (8th Cir. 2005)).

¶ 11                                    Judicial Notice

¶ 12      The City asks us to take judicial notice of several documents, including academic studies

and reports by a variety of governmental bodies, that no party presented to the trial court. See, *e.g.*, Fairness and Effectiveness in Policing: the Evidence (Wesley Skagen & Kathleen Frydl eds., 2004), *available at* http://www.nap.edu/catalog/10419.html); Dennis P. Rosenbaum & Cody Stephens, Reducing Public Violence and Homicide in Chicago: Strategies and Tactics of the Chicago Police Department (Center for Research in Law and Justice, 2005) (http://www.icjia.state.il.us/public/pdf/ResearchReports/Reducing PublicViolenceandHomicideinChicago.pdf). The City cites the reports as evidence that it has a sound basis for its methods for deploying police officers in response to 911 calls.

¶ 13    Courts may take judicial notice of facts proven by "immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy." *Vulcan Materials Co. v. Bee Construction*, 96 Ill. 2d 159, 166 (1983). However, courts " 'will not take judicial notice of critical evidentiary material not presented in the court below, and this is especially true of evidence which may be significant in the proper determination of the issues between the parties.' " *Vulcan Materials*, 96 Ill. 2d at 166 (quoting *Ashland Savings & Loan Ass'n v. Aetna Insurance Co.*, 18 Ill. App. 3d 70, 78 (1974)). This case resembles *Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984), in which the court rejected the petitioner's request that the court take judicial notice of facts found by a governmental commission. The City asks this court to take judicial notice of the substantive findings of governmental organizations and scholars on matters which the trial court may need to decide. The materials the City relies on go to the merits of plaintiffs' claims and do not address the issue of whether a court has jurisdiction to resolve those claims. Moreover, the City's discussion of the materials illustrates that they relate to the alleged justification for the City's deployment of police personnel, an inherently factual issue that the courts should not resolve in the context of a motion to dismiss. At the pleading stage of the proceedings, we must not take judicial notice of the new materials the City presents on this appeal. See *Vulcan Materials*, 96 Ill. 2d at 166; *Korematsu*, 584 F. Supp. at 1415.

¶ 14    We note particularly that the materials presented address the issue of whether a legitimate, nondiscriminatory policy objective justifies the City's methods for responding to 911 calls. No court should reach the issue of justification for the City's procedures unless the court finds that the complaint states a cause of action. See *Gallagher*, 619 F.3d at 834. If we find that the complaint survives the section 2-615 motion to dismiss, and therefore the City has grounds for presenting the cited materials on the issue of justification, the plaintiffs will have a right to discovery, so that they will have an opportunity to dispute the factual conclusions the City reaches on the basis of the reports and studies it cites. Ill. S. Ct. R. 201(b)(1) (eff. Jan. 1, 2013). In effect, by presenting these documents in support of a section 2-615 dismissal of the complaint, the City seeks to justify its procedures, without allowing the plaintiffs the opportunity to conduct discovery that could show the full scope of the disparate impact and counter the City's evidence of justification. We will not take judicial notice of the materials the City cites, and we will confine our review to the issue of whether the complaint states a political question of the kind that leaves the City's actions exempt from court review.

¶ 15                                    Political Question

¶ 16     The United States Supreme Court, in *Baker v. Carr*, 369 U.S. 186, set guidelines for determining whether a case presents a nonjusticiable political question. In *Baker*, the plaintiffs challenged a statute that apportioned representation in the Tennessee legislature. The *Baker* Court held:

> "The nonjusticiability of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. ***
>
> *** There are sweeping statements to the effect that all questions touching foreign relations are political questions. *** Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. ***
>
> ***
>
> *** The question in a particular case may not seriously implicate considerations of finality ***. Further, clearly definable criteria for decision may be available. In such case the political question barrier falls away ***. ***
>
>                                          * * *
>
> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 210-17.

¶ 17     Although the Tennessee legislature bore primary responsibility for apportioning legislative representatives to the state counties, the *Baker* court held that the courts had the power to review the legislature's decision and declare the apportionment invalid. As the Court held in *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960), "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."

¶ 18     Illinois courts have adopted the reasoning of *Baker*. See *Kluk v. Lang*, 125 Ill. 2d 306, 322 (1988). "The mere fact that political rights and questions are involved does not create immunity from judicial review." *Donovan v. Holzman*, 8 Ill. 2d 87, 93 (1956), quoted in

*Kluk*, 125 Ill. 2d at 323. Our supreme court explained:

"[T]he separation of powers principle has not been understood to mean a separation of functions between the three branches of government which is so 'distinct as to have no connection or dependence ***; but its true meaning, both in theory and practice, is, that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many. *** [T]here is *** a blending and admixture of different powers. This admixture in practice, so far as to give each department a constitutional control over the other, is considered, by the wisest statesmen, as essential in a free government ***.' [Citation.] *** While this court cannot exercise legislative powers [citation], the judiciary has always had the right and duty to review legislative acts in light of the Constitution." *Rock v. Thompson*, 85 Ill. 2d 410, 417-18 (1981) (quoting *Field v. People*, 3 Ill. 79, 83-84 (1839)).

¶ 19 Thus, the issue of whether a case presents a political question, immune from judicial review, depends on the particular question presented. Courts do not have authority to draw boundaries of school districts, but the courts can declare boundaries invalid if the boundaries deprive citizens of constitutional or statutorily protected rights. See *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 16 (1996). Courts lack sufficient guidelines to enforce a right to a "good" education, but the courts can enforce the right to a free education. *Edgar*, 174 Ill. 2d at 24-25. The Illinois Senate, and not the courts, bears responsibility for electing a senator as President of the Senate, but courts have jurisdiction to determine whether the Senate complied with its own rules when it purported to elect a President of the Senate. *Rock*, 85 Ill. 2d at 418-19.

¶ 20 Here, the trial court observed that the City has primary responsibility for deciding how to deploy police officers in response to 911 calls. But that allocation of primary responsibility does not immunize the City's decisions from judicial review. See *Rock*, 85 Ill. 2d at 417-18. To paraphrase the *Kluk* court, the City must devise a policy for deploying law enforcement personnel, not decide the issue of whether the policy implemented violates the Act. The General Assembly, by enacting the Act, gave courts the power to declare that any unit of state, county or local government has adopted "methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a) (West 2012). The General Assembly expressly empowered courts to "grant as relief any permanent or preliminary negative or mandatory injunction, temporary restraining order, or other order." 740 ILCS 23/5(b) (West 2012). Under the first criterion listed in *Baker*, we find that Illinois made no "demonstrable constitutional commitment of the issue" presented by the plaintiffs' complaint to a final, unreviewable determination by the City. *Baker*, 369 U.S. at 217.

¶ 21 The trial court also found that the courts lack manageable standards for determining how to deploy police officers in response to 911 calls. But the court may grant the plaintiffs relief, if the evidence warrants such relief, without determining how to deploy police officers. If the City proves unable to justify its administrative procedures for deploying police officers, the City will retain authority to devise procedures that have no unjustified discriminatory effects. The court would retain jurisdiction to review the City's plan only to determine whether the City succeeded in adopting a plan that meets the requirements of the Act. See *Gallagher*, 619

F.3d 823.

¶ 22 In *Gallagher*, the plaintiffs alleged that a municipality aggressively enforced housing regulations, issuing some citations for violations that had not occurred and allowing owners inadequate time to comply with discovered violations. The enforcement practices caused landlords to close some buildings and raise rents on others, resulting in a shortage of affordable housing. *Gallagher*, 619 F.3d at 834. The burden of the shortage fell most heavily on African-Americans, who made up a disproportionate percentage of lower-income households in the municipality. Although the court lacked authority to tell the municipality how to enforce its housing code, the court found that the complaint stated a cause of action, and not a political question exempt from judicial review. Similarly, the court in *Village of Woodbridge v. Board of Education of Community High School District 99*, 403 Ill. App. 3d 559, 571-72 (2010), held that a dispute between the village and the board over the village's power to take land in an eminent domain proceeding did not present a political question immune from review, because the eminent domain statute provided "clear criteria for the court to utilize to resolve this case."

¶ 23 Here, the Act provides sufficient standards for the court to apply to determine whether the City's policies for deployment of police personnel justify any disparate impact on African-Americans and Hispanics in terms of response times to 911 calls. We find the case similar to federal cases in which courts found sufficient guidelines for determining whether governmental plans alleviate the disparate impacts of past practices. See *Davis v. Board of School Commissioners*, 402 U.S. 33, 37 (1971); *Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 707-09 (9th Cir. 2009); *Neighborhood Action Coalition v. City of Canton*, 882 F.2d 1012 (6th Cir. 1989). Again, we find *Baker* helpful, as the Court there said, "Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial." *Baker*, 369 U.S. at 198. The Act provides standards courts can apply to decide whether administrative procedures create unjustified disparate impacts. See 740 ILCS 23/5 (West 2012). The need for manageable standards does not warrant dismissal of this lawsuit.

¶ 24 The other guidelines presented in *Baker* similarly provide no grounds for dismissing the lawsuit. The only policy determination at issue here concerns the disparate impact of administrative procedures on African-Americans and Hispanics, and courts have the competence needed to decide issues of such impact and justification for that impact. A decision in favor of the plaintiffs would indicate no lack of respect for the City's home rule powers, just as the *Baker* decision did not show a lack of respect for the Tennessee legislature, and the decision in *Gallagher* did not show a lack of respect for the city and its procedures for enforcing its housing code. See also *Modesto*, 583 F.3d at 707-09; *Canton*, 882 F.2d 1012. We see no unusual need for unquestioning adherence to the City's preferred methods for responding to 911 calls, and no potential for embarrassment from pronouncements by the City and the courts on the issue.

¶ 25 Following *Baker*, we find that the complaint does not present a nonjusticiable political question. Accordingly, we reverse the trial court's judgment and remand for proceedings in accord with this order.

¶ 26                                    CONCLUSION

¶ 27        In this appeal from the dismissal of the plaintiffs' complaint for failure to state a claim on which the courts can grant relief, the City asked this court to take judicial notice of a number of studies that the City cites as justifying its methods for responding to 911 calls. We find the materials irrelevant to the issue of whether the complaint states a justiciable claim, and not appropriate for judicial notice. The City will have the opportunity to present the studies to the trial court on remand, if the trial court must decide whether the City has just reason for the administrative methods it adopted. But the plaintiffs have the right to discovery on the issue of the extent of the disparate impact of administrative procedures as well as justification for those procedures. Ill. S. Ct. R. 201(b)(1) (eff. Jan. 1, 2013).

¶ 28        Courts have the power to order appropriate relief for the unjustified disparate impact of a city's administrative practices on certain racial and ethnic groups. No constitutional provision immunizes from judicial review the alleged disparate impact of the City's administrative methods for responding to 911 calls on distinct racial groups. The Act establishes standards for courts to use when confronted with allegations of such disparate impact. Accordingly, because the complaint does not present a nonjusticiable political question, we reverse the trial court's judgment and remand for further proceedings in accord with this order.

¶ 29        Reversed and remanded.